# Exhibit M

# Confidential

Excerpt from March 28, 2007 Deposition
of David Cohen

# EXHIBIT N

 

FORMAT FOR
PRINTING
sponsored by

**May 3, 2007**

## COMMENTARY

# When Activists Are Terrorists

**By JUDITH MILLER**
*May 3, 2007; Page A17*

Did the New York Police Department spy on peaceful groups and
citizens trying to exercise their constitutional right to protest the
renomination of President Bush at the Republican National
Convention in the summer of 2004? This is what civil liberties
groups allege, and what the NYPD denies. Who is right?

The issue is at the heart of several interrelated suits being
adjudicated in federal district courts in New York, many of them
filed on behalf of the 1,800 protesters who were arrested during the
largest protest at a political convention in American history. In its
complaints, the New York Civil Liberties Union, which represents
seven of those arrested, accuses the department of having violated
the law by its mass arrests, holding people in protracted custody for
minor violations, and fingerprinting those detained.

While the complaints themselves do not accuse the police of
monitoring citizens for their political views, Christopher Dunn, the
civil liberties group's associate legal director, said that there were
"many indications" that the police had investigated people who
posed no threat either to the city or the convention. The allegation
was echoed in a front-page, 2,500-word article that led the New
York Times in late March. Based partly on his review of more than
600 pages of the NYPD's still-secret "raw intelligence documents"
and "summary digests of observations from both the field and the
department's cyberintelligence unit," reporter Jim Dwyer concluded
that the NYPD's "R.N.C. Intelligence Squad" had chronicled the
views and plans of people who had "no apparent intention of breaking the law."

### DOW JONES REPRINTS

⟨ℝ⟩ This copy is for your personal,
non-commercial use only. To order
presentation-ready copies for
distribution to your colleagues,
clients or customers, use the Order
Reprints tool at the bottom of any
article or visit:
www.djreprints.com.

• See a sample reprint in PDF
format.
• Order a reprint of this article now.

Start a FREE
trial of the
Online Journal

Subscribe to
The Print Journal

Free US Quotes:

◉ Symbol
○ Name

Ⓑ

Get FREE E-Mail by topic

Check Out our Mobile &
Wireless Services

DIGEST OF EARNINGS

Details of the latest corporate
earnings reported for FREE.



Stung by the criticism, Police Commissioner Raymond W. Kelly, David
Cohen, the deputy police commissioner for intelligence, and Paul J.
Browne, the NYPD press spokesman, outlined in interviews last week
the nature of the police's concerns, its conduct, and the goals of its
intelligence surveillance effort that they told the Times and still argue
enabled some 800,000 people to protest peacefully and helped keep
New York safe. "The department was indifferent to the political views
of the attendees," said Mr. Cohen, a former senior official at the Central
Intelligence Agency. "The pre-convention surveillance was aimed solely

at maintaining civil order."

The outcome of these disputes has important ramifications, and not just for New York's efforts to identify and prevent terrorist and other threats to the city. It also risks tarnishing what the NYPD thinks should be regarded as a tremendous achievement.

What Mr. Cohen called the "co-mingled threat" of "terrorism, anarchist violence and unlawful civil disobedience" drove both the surveillance program and the policies of mass arrests and blanket fingerprinting. He said that there was no special "squad" to provide political intelligence for the convention, as the Times reported.

The 600-plus pages of still-secret intelligence documents that this reporter has also reviewed do list numerous peaceful organizations and individuals planning to attend the protests, including as the Times accurately noted, three New York City elected officials, street theater companies, church groups and antiwar organizations, environmentalists, and people opposed to the death penalty and other Republican policies. The documents also chronicle some seemingly innocuous planning for the protests -- such as the concerts being held in several cities by the satirical performance troop, Billionaires for Bush -- as well as legal training and other services that similar groups and individuals were providing, or planning to provide, protesters.

But the material this reporter read does *not* show that the police monitored such peaceful groups and individuals because they opposed their political views, and the police say groups like "Billionaires for Bush" were never infiltrated. Rather, the intelligence documents appear focused mainly on estimating the number and motivations of people who were planning to attend the convention, as well as potential threats to the gathering, its delegates and the police.

The raw intelligence files also focus on often innovative nonviolent and violent disruption techniques that were discussed at public meetings and on the Internet by more than 18 groups and coalitions planning protests at the convention, several of which have histories of violent activity at earlier demonstrations.

The courts will eventually decide whether such surveillance and policies derived from it were legal and appropriate. But my reading of the 600 pages of intelligence reports, coupled with interviews of senior police officials, a review of speeches, and documents involving the law suits, suggests that the department's surveillance effort was largely threat-driven. It was prompted by legitimate concerns about how to assure the safety of both New Yorkers and protestors, 65% of whom came from outside the state.

While the line between appropriate and illegal surveillance of political groups is not always obvious or as a matter of law clearly drawn, the police complain that the department's actions have not been framed in the context of the threat New York was facing.

In an interview, Mr. Cohen argued, for instance, that a balanced appraisal of the city's surveillance effort should have emphasized the "ongoing and continuous threat" confronting the police. Since 9/11, he said, the city has experienced or prevented 11 separate terrorist plots, roughly two a year -- beginning with the still-unsolved anthrax letter attacks of October, 2001, in which five people died (one in Manhattan), to the thwarting of a plot in July 2006 to destroy the PATH subway linking New Jersey to Lower Manhattan and blow up the retaining wall at Ground Zero to flood lower Manhattan.

The 18-month period between the selection of New York and the convention itself was "the most intense threat period of the post September 11 era to date," Mr. Cohen said. Six terrorist attacks by al Qaeda-related or inspired groups in far-flung Casablanca, Jakarta, Istanbul, Moscow and Madrid killed nearly 300 people and wounded more than 3,000 during that period.

The police also had to expect and prepare for the worst because of the violence surrounding earlier large protests since 1999. "Inadequate advance understanding, or knowledge of the plans and intentions of those prepared to commit violence, undermined earlier efforts to contain disruptions, Mr. Cohen said. At Seattle's WTO protest in 1999, for instance, a relatively small group of activists among crowds of at least 50,000 people triggered grotesque mayhem -- violent confrontations with the police, $3 million in property damage, and numerous injuries and arrests.

Mr. Cohen said, and his intelligence files suggest, that the police were concerned about four categories of protestors: anarchists and others openly committed to violently shutting down the city; a second, far-larger group intent on acts of civil disobedience to disrupt proceedings through peaceful if illegal means; individuals with criminal histories embedded in both these groups; and people who had previously tried to hide or alter their identities when arrested. It was the need to ascertain true identities, he said, that led to the decision to fingerprint those arrested. This, in turn, required the police to arrest demonstrators who were violating the law, rather than give them summonses, since people are fingerprinted only after an arrest.

Eight weeks before the convention, activists designated Aug. 31, 2004, in online postings as a day for civil disorder, the "Day of Chaos," or "A-31." Groups of anarchists began identifying protest targets in public advisories, press releases and on Web sites.

For many, Madison Square Garden, the convention site, was "ground zero," which activists discussed entering with false identification. Others planned to prevent delegates from reaching the convention by blinding bus driver windows or disabling charter buses, lying under vehicles, and using rented cabs and flotillas of bicycles to clog bus routes.

A least 24 hotels throughout the city hosting state delegations were identified on Web sites as delegation hosts at which protestors could converge to harass delegates and disrupt normal hotel business. Reinforced police presence at the Warwick, the Westin and Roosevelt, Commissioner Kelly said in a 2004 speech, prevented demonstrators from "rushing" the delegates' hotels.

The intelligence files show that activists had also planned, and later attempted unsuccessfully, to close down Wall Street, disrupt traffic at Herald Square and elsewhere, crash delegate parties, stage sit-ins in hotel and office lobbies, seal off subway stations with arrest tape and switch subway signs to disorient delegates. There were plans to vandalize retail stores like Starbucks and McDonalds with what Mr. Cohen called "brick and bomb tactics"; activists were also urged to disrupt Broadway performances attended by delegates on Aug. 31, designated as "Chaos on Broadway."

Other businesses seen as hostile to the activists' agenda -- the Carlyle Group, Chevron, the Rand Corporation and Hummer of Manhattan -- were designated for "direct actions" ranging from blocking entrances to breaking windows and setting fires. The files showed that activists with previous arrests for violent conduct were monitored by NYPD plain-clothes detectives, and that information about their convention plans was shared with police departments in other states and counties.

Activists discussed the use of disruptive tactics that had worked so well in Seattle -- Molotov cocktails, ammonium-nitrate bombs with nails, live CS canisters, Tiki Torches (soup cans filled with flammable substances attached to the end of a stick) water guns filled with flammable liquids and chemical irritants, urine or paint, and mobile infrared transmitters to change traffic signals.

The files document at least eight training sessions in New York and outside that were organized by anarchists and other experienced activists. Techniques for evading or countering the police were taught. The New York City Anarchist Tribes, for example, held martial-arts training in Manhattan in January, 2004. The Syracuse Peace Council, in Ithaca, N.Y., which planned to block traffic in New York, held weekend training aimed at "building our own radical activist infrastructure."

The "Constitutional Rights Enforcement and Support Team," an Internet-based group, stated on its Web site that "many people who join this group will die, be wounded, or jailed" in its efforts to counter "police brutality." Ashira Affinity, a Colorado-based anarchist group, urged members to join protests that were "strategic, ruthless, efficient, as well as chaotic."

In addition to the usual crackpot threats posted in Internet chat rooms, such as the one by a writer who vowed to "fly a 767 into the convention and take care of the American problem on Thursday" -- which the police nevertheless could ill afford to ignore -- came vaguer if still troubling counsel from would-be protestors: "Give them the New York they are afraid of," urged one listing.

In Queens, police arrested three "Black bloc" anarchists who had three imitation handguns, a butterfly knife, pellets and a map of New York City. A man arrested on Aug. 20 for criminal trespass and possession of burglary tools in the Mandarin Oriental Hotel, had been arrested more than 25 times in California for various offenses.

Critics of the police complain that never had so many protestors at a political convention been arrested. But Mr. Cohen notes that the arrest of some 1,807 out of nearly 800,000 protestors is the lowest arrest-to-crowd ratio of any major political gathering. Had the arrest-to-crowd ratio at a Miami protest in November 2003 been repeated in New York, 10,000 people would have been arrested.

The convention's only serious injury, Mr. Kelly said, was sustained by a detective who was pulled from his scooter and kicked unconscious by a demonstrator. He called the police's handling of the event one of his department's "finest hours," sentiments that were incidentally shared by the Times, which editorialized soon after the convention that the "intense planning" and "well-disciplined use of force" by the police had shown how disruptive tactics could be countered.

New York's fractious history over political surveillance has enhanced distrust between the city's police and civil libertarians. Though the Supreme Court has ruled that undercover surveillance of political groups is generally legal, the NYPD's abuses of political monitoring of anti-Vietnam war activists in the late 1960s led the courts to impose restrictions in 1985 on the department's monitoring of political protests. After the 9/11 attacks, however, the police sought and secured from the courts a loosening of those restrictions to prevent terrorism -- the so-called Handschu guidelines. But as a result, what kind of political surveillance the police can conduct is once again before the courts, and in the press.

Last February, the judge who had loosened the Handschu restrictions in 2003 harshly criticized the police in a separate but related political surveillance case involving the videotaping of protests,

ruling that there must be an "indication of unlawful activity" before a political group or a person's political activity can be investigated. The police have challenged that ruling on grounds that this would effectively restore the pre-9/11 limits. They fear it might also dissuade other law enforcement agencies from adopting a similar approach. In fact, the controversy is already having that effect.

That would be a pity. For although I am devoted to the First Amendment and privacy rights, and believe that effective judicial and administrative oversight is critical to preventing police abuses, I also want the NYPD to have the tools and programs to protect the city from terrorist attacks. If that means scanning the Internet and sending plainclothes officers to public meetings to learn about planned actions that might turn violent, or be infiltrated and taken over by violent dissidents, so be it. Unfortunately, the current controversy is already making other police departments wary of following the NYPD's effective tactics.

Some law enforcement officials in the Twin Cities fear there may be many arrests during the 2008 Republican convention there. But Tim Lynaugh, a police officer assigned to convention planning, said his department hopes there will be almost none. But with fewer than than 600 police officers (New York has 37,000 in uniform), they will probably need outside assistance to assure public safety.

While the NYPD's advice was helpful when officers from both departments met in January to discuss preparations, police in the Twin Cities would probably not emulate New York's surveillance program prior to its own convention, even if it had the manpower to do so. "If what we've read about their program is true," Mr. Lynaugh said, "That is just not how we operate."

*Ms. Miller, a former New York Times reporter, is a writer in Manhattan.*

**URL for this article:**
http://online.wsj.com/article/SB117816049350090539.html

**Copyright 2007 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT

# O



OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

**ROBERT M. MORGENTHAU**
DISTRICT ATTORNEY

October 24, 2006

(VIA HAND DELIVERY)

The Honorable James C. Francis IV
United States Magistrate Judge
United States District Court
500 Pearl Street, Room 1960
New York, New York 10007

> Re: Diedra MacNamara, et al. v. City of New York
> Index No. 04 CV 9216 (KMK) (JCF)

Dear Judge Francis:

The New York County District Attorney's Office (DANY) submits this letter brief in opposition to plaintiff's request for an order compelling DANY to produce thousands of documents generated during the arrests of 1800 or more individuals from August 27, 2004 to September 2, 2004, when the 2004 Republican National Convention was held here in New York City. The plaintiff's counsel, Clare Norins, hand-delivered the subpoena *duces tecum* upon the New York County District Attorney's Office ("DANY") at the conclusion of the May 31, 2006 discovery conference before your Honor. The May 31, 2006 subpoena calls for the production of "[a]ll documents pertaining to individuals who were criminally charged and/or prosecuted by the New York County District Attorney in connection with events occurring between August 27, 2004 and September 2, 2004 related to the 2004 Republican National Convention". The subpoena was returnable June 30, 2006. (*See*, Plaintiffs' Letter Brief of October 10, 2006 at Exhibit A).

## DANY Has Not Waived its Rule 45 (c) (2) (B) Objections:

Plaintiffs' assertion that DANY has waived its objection of undue hardship by failing to state its opposition to the subpoena until August 9, 2006, is disingenuous at best. During the May 31, 2006 conference plaintiff's attorney, Ms. Norins, stated she intended to request that DANY provide all documentation for each of the RNC arrests, including the non-party arrestees. At that time DANY expressed its concern over not only breadth of the subpoena, but also the hardship placed on non-party DANY in responding to such a request, particularly for those criminal cases which remained sealed pursuant to CPL 160.50 or 160.55. At the conclusion of that discovery conference Ms. Norins handed the undersigned the subject subpoena. Discussions as to proceeding on the subpoena were had at that point and *all agreed*, including Ms. Norins, that

DANY requests this Court quash that part of plaintiffs' subpoena which seeks documents provided by DANY to the City, a named party, and for an order requiring plaintiff to obtain the documents directly from Corporation Counsel. To the extent that Corporation Counsel has subsequently lost or misplaced these specific documents DANY consents to reproducing them for plaintiffs' counsel.

## B. Documents Pertaining to the 575 or More Remaining Named Plaintiffs:

Plaintiff also seeks an order compelling DANY to provide documents pertaining to the remaining named plaintiffs in this consolidated action. Plaintiff has not provided a list set forth the names or other identifying data as to the remaining named plaintiffs. From the outset it should be clear, the majority of the criminal cases have been sealed pursuant to CPL §§ 160.50 or 160.55[2]. Given the number of ACDs, dismissals and convictions on violations, it is necessarily true that DANY the majority of the remaining named plaintiffs must be sealed. DANY has received sealing waivers from many of the named plaintiffs designating Michael A. Cardozo, Corporation Counsel of the City of New York, or his representative, as the agent to receive documents pertaining to the criminal arrest. These authorizations are for release of documents to Corporation Counsel. The authorizations do not permit release to any other individuals, including those plaintiffs under Index No. 04 CV 9216. Plaintiffs have failed to provide DANY with any signed, notarized waivers from the remaining named plaintiffs which would authorize the release of information directly to these plaintiffs. As such, plaintiffs are not entitled to any of the documents contained in DANY's files for the remaining named plaintiffs whose cases have been sealed pursuant to CPL §§160.50 or 160.55[3].

As to the remaining named plaintiffs, DANY has not objected to the release, *to* Corporation Counsel, of the NYPD documents specified in plaintiffs' letter of September 28, 2006. Again, while DANY objected to the release of its DA Data Sheet, it will, abide by this Court's decision in Abdell, *supra.* The DA Data Sheet will be provided to each of the remaining named plaintiffs' attorneys upon request by that attorney. To the extent that DANY's files, for the remaining plaintiffs, contain the specific documents requested, copies have already been and continue to be provided to Corporation Counsel pursuant to the discovery procedures set forth above. DANY, however, does oppose plaintiffs' request that DANY re-review those files and re-produce duplicate of documents provided to either Corporation Counsel or one of the other named plaintiffs.

---

[2] DANY's statistical information reflects that there were approximately 1806 arrests brought to DANY by NYPD. Of those arrests: 19 plead guilty to an A misdemeanor; 2 were convicted of an A misdemeanor; 3 plead guilty to a B misdemeanor; 135 plead guilty to a violation; 19 were convicted of a violation; 1091 received an Adjournment in Contemplation of Dismissal pursuant to CPL 170.55; DANY declined to prosecute 4 arrests; 35 were acquitted after trial; 461 were dismissed outright; 2 cases remain open and pending in criminal court; and 35 defendants bench warranted and those warrants remain outstanding (*see*,Exhibit G).

[3] Assuming plaintiff is able to obtain the requisite authorizations from the remaining named plaintiffs or, in the alternative, the remaining named plaintiffs' attorneys assert they are authorized on behalf of their clients to provide such a waiver, then plaintiff should obtain copies from either the remaining named plaintiffs' attorneys or from Corporation Counsel. *See,* Thomas v City of Mount Vernon, 1990 U.S. Dist. LEXIS 3036, at *4 (S.D.N.Y. 1990) (denying motion to compel non-party District Attorney's Office to comply with subpoena demanding production of police documents, absent a showing that such documents could not be obtained from the police department).

documents on the 1200 non-party arrestees. DANY urges this Court to quash that part of plaintiffs' subpoena which would imposes an undue burden on DANY and its resources.

Should this court unseal all the names of the non-party arrestees and should this court further order that DANY must pull and review all such non-party files and provide documents therefrom to plaintiffs, it is estimated that the process will take DANY a minimum of 9 to 12 months to complete. While DANY has been providing documents to the city and the named plaintiffs that process has been on going for better part of a year, yet only involves 600 or so plaintiffs. Here the files relate to 1200 or more non-party arrestees. Clearly, it will take DANY as long, if not longer to complete that review.

### 3. Decline to Prosecute Forms:

Plaintiffs also seek access to any "*Decline to Prosecute Documents*". There were four cases which fall into this category. It is unclear if they relate to named parties or non-party arrestees. Typically, there is one document filled out if and when DANY exercises its discretion and declines to prosecute an arrest by law enforcement. Depending on the training and experience of the Assistant District Attorney, the document usually expresses the opinion of the reviewing attorney as to why the matter will not be prosecuted. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings,* 219 F.3d at 191; *United States v. Adlman,* 134 F.3d 1194, 1204 (2d Cir. 1998) (*"Adlman II"*). Moreover, since these cases remain sealed, DANY is not in a position to know what the document actually states so that it can know whether the document contains only opinions of the reviewing Assistant District Attorney, or merely factual data, or both. Therefore, should this court grant plaintiffs' application to unseal the names of the 1200 or more non-party arrestees, along with certain documents, DANY reserves its rights to be able to offer detailed objections concerning the production of documents contained within those files once it has had the opportunity to review the file. However, DANY's inability to raise specific objections at this time should not be construed as a waiver of that right to raise objections upon receipt of the proper authorization. In the alternative, DANY will consent to an *in camera* inspection by the Court for a determination as to any potential privilege barring the documents release, as well as a judicial determination as to the relevance of the document to either of the named parties allegations.

### Conclusion

In accordance with the above discussion, DANY respectfully urges this Court to quash plaintiffs' subpoena in its entirety.

Respectfully Submitted,

Patricia Bailey (PJB 3362)
Assistant District Attorney

cc: Clare Norins, Esq. (via hand delivery)
    James Mirro, Esq. (via mail)
    Gerald Smith, Esq. (via mail)

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MICHAEL SCHILLER, FRANCESCA                  :
FIORENTINI, ROBERT CURLEY, and               :
NEAL CURLEY,                                 :
                                             :
                    Plaintiffs,              :
                                             :
        vs.                                  :
                                             :    04 Civ. 7922 (KMK) (JCF)
                                             :
The CITY OF NEW YORK; RAYMOND                :
KELLY, Commissioner of the New York City     :
Police Department; TERENCE MONAHAN,          :
Assistant Chief of the Bronx Bureau of the New  :
York City Police Department,                 :
                                             :
                    Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HACER DINLER; ANN MAURER;                    :
ASHLEY WATERS;                               :
                                             :
                    Plaintiffs,              :
                                             :    04 Civ. 7921 (KMK) (JCF)
                                             :
        vs.                                  :
                                             :
The CITY OF NEW YORK; RAYMOND W.             :
KELLY, Commissioner of the New York City     :
Police Department,                           :
                                             :
                    Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DEPUTY COMMISSIONER DAVID COHEN

DAVID COHEN, declares under penalty of perjury pursuant to 28 U.S.C. §1746,

that the following statements are true and correct:

1.    I am the Deputy Commissioner of Intelligence for the New York City Police

Department ("NYPD"), a position I have held since early 2002. In that capacity, I have overall

responsibility for the operation of the NYPD Intelligence Division, including the gathering and analysis of information about potential criminal activity and terrorism.

2.    I have personal knowledge of the facts set forth below, and submit this declaration in opposition to plaintiffs' motion to compel the disclosure of all documents containing information collected by the NYPD's Intelligence Division between April 1, 2003 and September 2, 2004 about individuals and groups connected to demonstrations expected to take place during the Republican National Convention in August of 2004.

3.    I have had a long career as an intelligence officer. I served for 35 years with United States Central Intelligence Agency (the "CIA") holding positions in both its analysis and operational arms. As the Director of the CIA's Directorate of Operations during 1995-1997, I was responsible for all the Agency's worldwide intelligence and information gathering operations. As the Deputy Director of the Directorate of Intelligence from 1991-1995, I provided day-to-day leadership for the CIA's analysis program, including the substantive review of all CIA political, economic and military assessments prepared for the President and his senior national security advisors.

4.    The Intelligence Division supports the NYPD's law enforcement efforts in the prevention or investigation of crime and acts of terrorism through the gathering and analysis of information.

5.    When it was announced in February 2003 that New York City would host the Republican National Convention (the "RNC" or the "Convention"), the NYPD immediately began developing plans to provide a safe and secure environment for (i) the participants in the Convention process including the President and Vice President of the United States, (ii) the hundreds of thousands of people expected to come to the City to engage in protest activity, (iii)

- 2 -

summer tourists and (iv) City residents and businesses. In addition to the usual policing responsibilities posed by a large scale political event, the City's status as a prime target of international terrorism compounded the challenge of maintaining the public safety[1]. Indeed, in July of 2003, the Department of Homeland Security classified the RNC as a Special National Security Event.

6.    The role of the Intelligence Division was to collect information to learn about the extent and nature of expected demonstration activity for purposes of police resource allocation, and to identify and assess any threat to the safety and security of the City presented by individuals or groups who viewed the RNC as target for terrorist acts, other acts of violence or disorder.

7.    Given the nature of the event, the RNC quickly became a focal point for voicing opposition to the policies of the Bush administration. Groups and individuals across the country availed themselves of the communication potential of the internet for organizing protest. Some declared an intent to engage in unlawful conduct ranging from civil disobedience at one end of the spectrum, to violence at the other. This was of real concern to the NYPD because the history of protest activity in major cities, including events in Seattle in 1999 during the meeting of the World Trade Organization, demonstrated that the police could be easily overwhelmed in the absence of adequate preparation.[2]

---

[1] There were terrorist bombings in Casablanca, Morocco, Jakarta, and Istanbul in 2003. There were subway and rail attacks in Moscow and Madrid in 2004. As a result of the capture of an Al-Qaeda operative in 2004 we learned about detailed surveillance of New York City targets. A terrorist plot to bomb the Herald Square subway station, one block from Madison Square Garden, was brought to light in 2004.

[2] Extremist elements in protest organizations had caused injury, property damage and disrupted events in Quebec and Genoa in 2001, and in Cancun, San Francisco and Miami in 2003.

8.     The Intelligence Division obtained information about potential unlawful activity by monitoring publicly available websites and press reports ("on-line resources") as well as by using other lawful investigative means available to it.

9.     Throughout the preparation process, I was kept fully informed of the information being developed by my staff. It was my responsibility to analyze that information and to brief the RNC Executive Committee (consisting of Police Commissioner Kelly, Chief of Department Joseph Esposito and various other NYPD executives (the "Committee")) concerning the nature and scope of expected demonstration activity and the threats to the security of the City during the RNC.

10.    From October of 2003 through June 2004 my staff prepared weekly reports. As the Convention approached, during July and August of 2004 reports were prepared in bullet format and with greater frequency. In the week of the Convention, they increased to twice daily. The vast majority of information contained in the reports was drawn from on-line resources. These reports (collectively the "Reports") have been produced to plaintiffs.

11.    I met with the Committee regularly, and with increasing frequency as the RNC approached. I provided the Committee with information contained in the Reports.

12.    I am informed by the City's counsel that in addition to the Reports, plaintiffs have now requested production of all other documents generated by the Intelligence Division concerning groups or individuals connected to demonstrations during the RNC for the period from April of 2003 to September of 2004 (the "Requested Documents").

13.    My staff discussed the information contained in the Requested Documents with me as it was being developed, and I considered it as part of the body of information I analyzed on a continuing basis.   Nothing I learned in my discussions with my staff changed my

- 4 -

assessment that the City faced serious threats of violence and disorder similar to what had occurred in Seattle, Quebec, Genoa, Cancun, San Francisco and Miami, a threat compounded by the status of the City as a target of terrorism. This is the assessment I conveyed to the Committee.

14. The Reports fairly reflect the information on which my assessments as to potential disorder were based, as well as the substance of the information I provided to the Committee in my regular briefings.

Dated: New York, New York
       May 2, 2007

David Cohen
Deputy Commissioner of Intelligence

- 5 -

# EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 03-27-08
```

BARBARA HANDSCHU, RALPH DIGIA, ALEX :
MCKEIVER, SHABA OM, CURTIS M. POWELL :
ABBIE HOFFMAN, MARK A. SAGAL,           :
MICHAEL ZUMOFF, KENNETH THOMAS,         :
ROBERT RUSCH, ANNETTE T. RUBENSTEIN, :
MICKEY SHERIDAN, JOE SUCHER, STEVEN     :
FISCHLER, HOWARD BLATT, ELLIE           :        71 Civ. 2203 (CSH)
BENZONI, on behalf of themselves and all others :
similarly situated,                      :
                                         :
                        Plaintiffs,      :
                                         :
            -against-                    :        MEMORANDUM OPINION
                                         :        AND ORDER
SPECIAL SERVICES DIVISION, a/k/a Bureau of :
Special Services; WILLIAM H.T. SMITH,    :
ARTHUR GRUBERT; MICHAEL WILLIS;          :
WILLIAM KNAPP; PATRICK MURPHY;           :
POLICE DEPARTMENT OF THE CITY OF NEW :
YORK; JOHN V. LINDSAY; and various       :
unknown employees of the Police Department :
acting as undercover operators and informers, :
                                         :
                        Defendants.      :
------------------------------------------------------ x

HAIGHT, Senior District Judge:

## I. BACKGROUND

This ongoing litigation had its genesis in 1971, when plaintiff citizens of New York City

complained that those in charge of the New York City Police Department ("NYPD") were

conducting surveillance and intelligence-gathering activities that violated their rights under the

United States Constitution. A class was certified and a consent decree entered establishing

guidelines governing police conduct during investigations of political activity ("the Handschu

Guidelines" or "the Guidelines"). The Guidelines were amended on the NYPD's motion following

the events of September 11, 2001.[1] Disputes have continued to arise between Class Counsel and the

City's Corporation Counsel, representing the NYPD, concerning the meaning and implementation

of the Guidelines. The Court has filed a series of opinions in the case.   This opinion bears the

vintage number "*Handschu IX.*" Familiarity is assumed with the Court's most recent opinion and

order, *Handschu VIII*, 2007 WL 1711775 (S.D.N.Y. June 13, 2007) (hereinafter "the 6/07 Opinion"

or "the 6/07 Order"), as well as with *Handschu I - Handschu VII*, cited and summarized in *Handschu*

*VIII* at \*1-5. *Handschu V*, 288 F. Supp. 2d 411 (S.D.N.Y. 2003), is referred to hereinafter as "the

8/03 Order." *Handschu VII*, 475 F. Supp. 2d 331 (S.D.N.Y. 2007), is referred to hereinafter as "the

2/07 Order." The facts of the case are recounted only to the extent necessary to explicate the present

disputes and the Court's resolution of them.   Those disputes arise in the context of the NYPD

Guidelines the NYPD included in its Patrol Guide as the result of the Court's prior opinions and

orders. *See* the 6/07 Opinion, 2007 WL 1711775, at \*1-4. The full text of the NYPD Guidelines

appears as an appendix to the 8/03 Order. *See* 288 F. Supp. 2d at 419-30.

The Court's 2/07 Order granted Class Counsel's motion to enjoin the implementation of

Interim Order 47 ("Order 47") issued by NYPD Commissioner Raymond Kelly to regulate the

NYPD's photographing and videotaping of public demonstrations and participants in them.

Corporation Counsel was dissatisfied by the 2/07 Order and moved under Rules 59 and 60(b)(1),

Fed. R. Civ. P., and Local Rule 6.3 to vacate or modify it. The Court's 6/07 Order vacated its 2/07

Order and appeared, on its face, to give the NYPD much of the relief it asked for.   But Corporation

---

[1] Throughout this litigation the Corporation Counsel of the City of New York, who represent
all the defendants, have referred to the defendants collectively as "the City." The Court's opinions
refer to the principal defendant as "the NYPD." For purposes of this and the prior opinions, the
terms are synonymous.

2

Counsel remain dissatisfied. Brush fires of controversy continue to burn. To understand the nature

of the continuing disputes, it is necessary to recite certain of the Court's prior holdings in some

detail.

**A.    What the 6/07 Opinion Held**

The 6/07 Opinion contains four holdings.

First, I held that "under the present wording of the consent decree and the Guidelines, police

conduct must violate a class member's constitutional rights in order to sustain a motion by Class

Counsel to hold the NYPD in contempt." 2007 WL 1711775, at *10. That holding accepted the

NYPD's contention that the Court's 2/07 Order was inconsistent with its 8/03 Order. Accordingly,

the Court vacated the 2/07 Order.

Second, I held that since "[t]he NYPD Guidelines resulted from a promise made to the Court

by the NYPD," were "enacted in compliance with an order of the Court," and were expressly ordered

to "remain in the NYPD Patrol Guide unless otherwise directed by the Court," those acts "brought

the NYPD Guidelines within the ambit of the court's equitable power," 2007 WL 1711775 at *10,

*12; and "if it were shown that the NYPD had adopted a policy that disregards the NYPD

Guidelines, the Court may exercise its continuing equitable powers in granting appropriate injunctive

relief," *id.* at *20. That holding rejected the NYPD's contention that "Class Counsel cannot

complain of and the Court cannot consider NYPD conduct that violates the NYPD Guidelines but

not the Constitution." *Id.* at *10. I further explained that, in the specific context of the NYPD's

videotaping practices, such equitable relief "could not be premised upon isolated and aberrant

photographing or videotaping in manners that did not comply with the NYPD Guidelines"; rather,

"Class Counsel would have to demonstrate that the NYPD, in the course of photographing or

3

videotaping public gatherings and their participants, systematically and repeatedly disregarded the NYPD Guidelines, to a degree sufficient to show a NYPD policy to act in such a fashion." *Id.* at *20.

Third, I held that the NYPD Guidelines only apply when the police collect information for the purpose of investigating political activity. 2007 WL 1711775, at *14-16. However, I noted that "the NYPD's proffered purpose is not necessarily determinative," and that a purpose to investigate political activity "could be inferred from objective indicia," such as the manner of investigation or the subsequent use of collected information. *Id.* at *16. I also explained that "while an investigative purpose [meaning a purpose to investigate political activity] is required in order for the [NYPD] Guidelines to apply, the presence of a non-investigative purpose does not preclude application of the [NYPD] Guidelines," *id* at *15; and I specifically noted that "the NYPD Guidelines might still apply in the presence of a legitimate law enforcement purpose, so long as there was *also* a purpose to investigate political activity," *id.* at *15 n.16.

Fourth, after considering the texts, I held: "The NYPD Guidelines are therefore not violated by Order 47 on its face," 2007 WL 1711775, at *20. That holding accepted the NYPD's contention. However, I went on to say: "But in the light of the foregoing analysis, there remains the possibility that they could be violated by Order 47 as applied." *Id.* That latter observation sets the stage for the ongoing disputes revealed by the most recent submissions of the parties. They are sparked by what I then said in the 6/07 Opinion, part of which was also quoted *supra*:

> It is that entire picture that would need to be examined in order to discern whether a purpose to investigate political activity was present, and if so, whether the photographing or videotaping of a demonstration violated the NYPD Guidelines.

4

It is for Class Counsel to say whether Class Counsel believe they presently have sufficient evidence to make such a case, particularly in light of the NYPD's recently submitted affidavits after months of imprudent delay. Should Class Counsel believe that Order 47 has been applied in a manner that violates the NYPD Guidelines and should they consider an evidentiary hearing necessary to resolve the as-applied question, they may make that application to the Court. Similarly, they may reapply for discovery of the documentation required by Order 47 in order to assess the Order's implementation by the NYPD.

It is useful to emphasize that while for the reasons stated in Part II.C., *supra*, this Court has equitable powers to enforce the promise the NYPD gave and memorialized in the NYPD Guidelines in order to obtain the Court's modification of the consent decree, a finding that the NYPD broke that promise could not be premised upon isolated and aberrant photographing in manners that did not comply with the NYPD Guidelines. To trigger the Court's equitable powers, Class Counsel would have to demonstrate that the NYPD, in the course of photographing or videotaping public gatherings and their participants, systematically and repeatedly disregarded the NYPD Guidelines, to a degree sufficient to show a NYPD policy to act in such a fashion.

20007 WL 1711775, at *20. That analysis echoes *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978), cited at *20 n. 20.

**B.    The Present Applications of the Parties**

There are two applications presently before the Court.

First, the NYPD moves for an order amending, altering, or reconsidering the 6/07 Order pursuant to Federal Rule of Civil Procedure 59 and Local Civil Rule 6.3. Corporation Counsel contend that the 6/07 Opinion improperly overlooked Section X of the NYPD Guidelines, captioned "Reservation," which states that the Guidelines "may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party" and do not "place any limitation on otherwise lawful investigative and litigative prerogatives of the NYPD or the City of New York."

5

In light of this provision, Corporation Counsel propose that any proceeding challenging a policy on the ground that it disregards or violates the NYPD Guidelines must be (1) subject to a threshold determination of whether there is a legitimate law enforcement purpose for the challenged policy (because "the Section X Reservation permits law enforcement activity supported by a legitimate law enforcement purpose," Corporation Counsel Brief dated June 27, 2007 at 6), and (2) submitted to the Handschu Authority for investigation and report, without the participation of Class Counsel, prior to any proceedings before this Court.[2]

Second, Class Counsel "ask the Court for permission to seek discovery of the documentation required by Interim Order 47, in order to assess the Order's implementation by the NYPD." Class Counsel Letter Brief dated July 2, 2007 at 1-2. Class Counsel suggest that such discovery will help it demonstrate "that the NYPD videotaping policy involves the widespread and systematic recording of political activity in circumstances where such recording is not supported by a law enforcement purpose and that, therefore, it is the custom and practice of the NYPD to violate the Modified Handschu Guidelines." *Id.* at 2.

## II. DISCUSSION

### A.    The NYPD's Motion for Amendment, Alteration, or Reconsideration

Corporation Counsel moves for relief upon Federal Rule of Civil Procedure 59 and Local Civil Rule 6.3. Corporation Counsel also filed a notice of appeal from the 6/07 Opinion and Order. Class Counsel moved in the Court of Appeals to dismiss the appeal. Before the Court of Appeals ruled on that motion, the parties stipulated to the withdrawal of the notice of appeal. The case is now

---

[2]    The NYPD's successful motion to modify the Handschu Guidelines limited the responsibilities and powers of the Handschu Authority. Corporation Counsel's present suggestion would expand them.

6

before this Court on the NYPD's motion under Rule 59 and Local Rule 6.3. Class Counsel contend

that the motion does not lie under Rule 59 because that Rule applies only to appealable judgments

or orders. In Class Counsel's view, the 6/07 Order cannot be so characterized. The parties have

exchanged erudite briefs on that question. I need not resolve it because the NYPD's motion clearly

lies under Local Rule 6.3. That Rule allows a party to move for reconsideration of a court's order

or decision on a motion on the ground, *inter alia*, that the Court overlooked material matters or

controlling authority. In the case at bar, the NYPD contends principally that this Court's 6/07

Opinion and Order overlooked Section X of the NYPD Guidelines, captioned "Reservation," with

which the NYPD Guidelines conclude. Specifically, the NYPD relies upon the last paragraph of the

Section X Reservation, which as previously noted states:

> These guidelines are set forth solely for the purpose of internal
> NYPD guidance. They are not intended to, do not, and may not be
> relied upon to create any rights, substantive or procedural,
> enforceable at law by any party in any matter, civil or criminal, nor do
> they place any limitation on otherwise lawful investigative and
> litigative prerogatives of the NYPD or City of New York.

On this motion the NYPD does not ask explicitly for reconsideration of the 6/07 Opinion's

holding that the Court has the equitable power to enforce the NYPD's promise to abide by the NYPD

Guidelines. Instead, the NYPD focuses upon the quoted Reservation. Its argument is distilled in

Corporation Counsel's Reply Letter Brief dated July 23, 2007 at 1:

> At the heart of the City's motion is the principle that the equitable
> power to enforce the NYPD's promise to abide by the [NYPD]
> Guidelines must take into account that the Section X Reservation
> limits the creation of any rights on the part of the class to enforce the
> [NYPD] Guidelines. The class cannot gain though the back door
> what neither the Consent Decree nor the [NYPD] Guidelines permit,
> namely the right to initiate proceedings to enforce the [NYPD]
> Guidelines in the absence of a Constitutional violation.

7

The NYPD's argument appears to be that while the Court has the equitable power and the duty to oversee and correct NYPD policies that disregard the NYPD Guidelines but do not violate the Constitution (as indeed the 6/07 Opinion held), the Section X Reservation significantly limits the Court's oversight function and Class Counsel's ability to participate in the process. Furthermore, the NYPD's motion appears to suggest that the Court's previously noted holding that "the NYPD Guidelines might still apply in the presence of a legitimate law enforcement purpose, so long as there was *also* a purpose to investigate political activity" was mistaken in light of the Section X Reservation.

The 6/07 Opinion did not specifically discuss the Reservation. Corporation Counsel properly invoke Local Rule 6.3 to suggest that the Court improperly overlooked it.

The Court did discuss the Section X Reservation in *Handschu V*, 288 F. Supp. 2d 411, a/k/a the 8/03 Order. That opinion granted Class Counsel's motion to have the NYPD Guidelines, included in the Patrol Guide, made a part of the Court's order and judgment in the case. Class Counsel proposed "to leave unchanged the 'Reservations' paragraph with which the Modified Handschu Guidelines appearing in the NYPD Patrol Guide concludes, but to include in a revised Order and Judgment language to the effect that (to quote counsel's letter) 'the last paragraph of the Guidelines shall be read in the light of the fact that the Guidelines are incorporated in the Consent Decree, and procedures under the Consent Decree may be pursued in case of an alleged violation of the Decree.'" *Id.* at 418. I stated approvingly that "[t]his approach gives the plaintiff class an increased protection warranted by recent events without unfairly burdening the NYPD," observed that "[r]etention of the Guidelines' 'Reservations' paragraph continues to insulate the NYPD from

8

*individual legal actions* based upon perceived failures to follow the Guidelines which do not rise to

a constitutional level," and concluded with the reflection that "the history of this class action, going

back to the entry of the first consent decree in 1985, reflects the parties' understanding that *Class

Counsel, not individual plaintiffs*, would bring any motion to hold the NYPD in contempt." *Id.* at

418-19 (emphasis added) (footnote omitted).

In *Handschu V*, I interpreted the Section X Reservation to support the distinction the opinion

drew between Class Counsel, representing the entire plaintiff class, and individual class members

as plaintiffs. That distinction reflects the central role played by Class Counsel in this ongoing case,

and the practical benefit to the Court and all parties (including the NYPD) of entrusting Class

Counsel with the protection of the interests of all class members. *Handschu V* dealt principally with

constitutional claims. The 6/07 Opinion, dealing with the Court's equitable Guidelines oversight,

also emphasizes Class Counsel's key role. The 6/07 Opinion summarizes the second question

presented as "whether, under the consent decree and the Guidelines as they are presently worded,

Class Counsel cannot complain of and the Court cannot consider NYPD conduct that violates the

NYPD Guidelines but not the Constitution," and answers that question in the negative. 2007 WL

1711775, at *10.

Given the Court's prior holdings in the case, and upon careful reconsideration, I conclude

that Section X's limitation on the creation of enforceable rights, properly understood, prohibits (1)

*individual* legal actions based on violations of the NYPD Guidelines, and (2) legal actions in the

name of the plaintiff class based on *isolated instances* of violations of the NYPD Guidelines that do

not rise to constitutional violations; but the Section X Reservation does not preclude *Class Counsel*

from challenging NYPD *policies* that disregard the NYPD Guidelines.

I am unpersuaded by Corporation Counsel's claim, based on the Section X Reservation, that the NYPD Guidelines place no limitation on police activity whenever there is a legitimate law enforcement purpose. Such a reading would effectively eviscerate the substantive requirements of the NYPD Guidelines, and is unreasonable in the history and context of the case. When the NYPD promised to adopt the NYPD Guidelines, when the Court conditioned the granting of the NYPD's modification motion upon the enactment of the NYPD Guidelines, when the Court ordered the NYPD Guidelines to remain in the NYPD Patrol Guide, and when the Court incorporated the NYPD Guidelines into the consent decree and amended judgment, the parties and the Court clearly had in mind the *substantive* provisions of the NYPD Guidelines—the actual *guidelines* for investigation—and not merely a commitment that the police act with some "legitimate law enforcement purpose." I take this opportunity to adhere to and reaffirm the holdings in the 6/07 Opinion, previously noted, that while an NYPD purpose to investigate political activity "is required for the [NYPD] Guidelines to apply," the concomitant presence of a different purpose "does not preclude the application of the [NYPD] Guidelines," and that "the NYPD Guidelines might still apply in the presence of a legitimate law enforcement purpose, so long as there was *also* a purpose to investigate political activity." 2007 WL 1711775, at *15, *15 n.16.

Given this analysis of the Section X Reservation, and viewing the Reservation in the setting of the Court's prior rulings and the totality of the circumstances of the case, I reject Corporation Counsel's contention that any challenge by Class Counsel to an NYPD policy on the ground that it disregards or repudiates the NYPD Guidelines on investigations into political activity is subject to a threshold determination of whether there is also a legitimate law enforcement purpose, or must be submitted to the Handschu Authority for investigation, before the matter may be considered by this

10

Court.

**B.    Class Counsel's Request for Discovery**

Class Counsel has applied to the Court for "permission to seek discovery of the documentation required by Interim Order 47, in order to assess the Order's implementation by the NYPD." Class Counsel Letter Brief dated July 2, 2007 at 2-3.

If the responsible NYPD officers complied with the documentation requirements contained in Interim Order 47, a considerable paper trail was generated by each police request for the use of photographic or visual recording (videotaping) equipment. Specifically, Order 47 requires a "ranking officer" of the Department who is contemplating the use of photographic or videotaping equipment to submit a written report "on typed letterhead" to his or her "Patrol Borough/Bureau Commander" requesting the deployment of such equipment and trained personnel. The request must include the date, time, and location of the incident or event to be recorded; the identity of the individuals or groups involved; and "the specific permissible objective(s) to be achieved." A Patrol Borough/Patrol Commander is required to enter each such request in a log maintained for that purpose, and to document the approval or disapproval of the request, giving the reasons for a disapproval. Upon completion of an approved photographing/videotaping, the recordings are to be maintained "for a minimum of one (1) year from the date the images were recorded," and a "written summary describing the event and activities preserved in each recording, to assist in indexing and retrieval" must be prepared. After one year, materials that do not contain evidence of criminal activity or are not "deemed valuable for other purposes, for example, litigation, training, after action reports, etc." and consequently are not preserved for that reason "may be destroyed." Interim Order 47 at 2-4.

11

As I have previously observed, in a letter dated July 2, 2007 at 1-2, Class Counsel state:

> Counsel for the Handschu plaintiff class now ask the Court for permission to seek discovery of the documentation required by Interim Order 47, in order to assess the Order's implementation by the NYPD. We note that there is an outstanding notice for discovery, which we intend to amend and re-serve. After conducting such discovery, we will ask to present evidence to the Court, in support of the pending motion of the plaintiff class, that the NYPD videotaping policy involves the widespread and systemic recording of political activity in circumstances where such recording is not supported by a law enforcement purpose and that, therefore, it is the custom and practice of the NYPD to violate the Modified Handschu Guidelines.

With all due respect to counsel, there is a degree of advocate's breast-beating in this passage. Counsel's professed belief of what discovery will unearth is entirely conclusory. The only evidence presently in the record has to do with the videotaping of two public demonstrations referred to in prior opinions, where the descriptions contained in affidavits submitted by class member witnesses and NYPD attorney witnesses are irreconcilable. *See* the 6/07 Opinion, 2007 WL 1711775, at * 4-6.

That limited amount of present proof leads Corporation Counsel to dismiss Class Counsel's present discovery request as based upon "the mere whim of class counsel, without regard to whether or not there is a factual basis for believing a policy exists," and to contend that granting the discovery "amounts to monitoring of the NYPD by class counsel, a result grossly at odds with the Consent Decree." With equal respect to counsel, there is also some advocate's chest-beating here. A "monitor," in consent decree parlance, is appointed by a court to observe, direct, and report upon future conduct of the individuals or entity being monitored. Class Counsel would not perform that function. Their discovery, if granted, would be confined to presently existing documents generated by Interim Order 47 from the date it became effective to the date of the Court order granting discovery. And it is unfair to disparage Class Counsel's request as indulging a "mere whim," given the vastly differing accounts of the public events contained in the record.

12

I think it obvious that the requested discovery may shed light on disputed factual issues with respect to the NYPD's implementation of Interim Order 47. For example, the documentation may help indicate whether the undisputed fact that Deputy Commissioner Cohen, charged with the supervision of investigations into political activity, has never been asked to approve a request to videotape under the Interim Order 47 protocol is indicative of an NYPD policy to disregard the NYPD Guidelines. I should not be understood as predicting such a revelation. I say only that Class Counsel is entitled to inquire.

The document discovery requested by Class Counsel is limited in scope, namely, the documents generated by the operation of Interim Order 47. This will not unduly burden the NYPD. After that production is made, Class Counsel will bear the burden of justifying further discovery or other litigation with respect to the sort of claim described in the 6/07 Opinion, 2007 WL 1711775, at *20. Class Counsel's present request for discovery will be granted.

If these documents are content-sensitive, safeguards are available: an attorneys'-eyes-only confidentiality order; prohibiting or limiting copying; and related remedies. These are only suggestions. I intimate no present view as to what safeguards, if any, should actually be put in place. Counsel are directed to work together in the mutual good faith that has characterized this case to agree on a protective order, should one be desired. Absent an agreement, the Court will resolve any differences.

### III. CONCLUSION

For the foregoing reasons, the Court makes this Order:

1. Assuming without deciding that the 6/07 Opinion and Order fall within the ambit of Fed. R. Civ. P. 59, the NYPD's motion for relief under Rule 59 is DENIED.

13

2. The NYPD's motion for reconsideration under Local Civil Rule 6.3 is DENIED.

3. Class Counsel's request for discovery, as set forth in their Letter Brief dated July 2, 2007,

is GRANTED.

4. The case will proceed in a manner consistent with this Opinion and Order.

It is SO ORDERED.[3]

Dated: New York, New York
       February 27, 2008

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[3] Presumably Corporation Counsel will consider filing another notice of appeal. Whether the 6/07 Order and this Order are appealable is for the Court of Appeals to decide. If those Orders are not appealable as of right, and given the importance of the issues presented, this Court would consider an application to certify the Orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). There is precedent for an interlocutory appeal from a district court's discovery order. In *Herbert v. Lando*, 73 F.R.D. 387 (S.D.N.Y. 1977), a defamation action brought by a public figure against a television station, this Court granted an order compelling discovery of the defendants' editorial processes in producing the program in question. The Second Circuit reversed. 568 F.2d 974 (2d Cir. 1977). The Supreme Court granted certiorari, reversed the Second Circuit, and reinstated this Court's discovery order. 441 U.S. 153 (1979).

14

# EXHIBIT R

## Clare Norins

**From:** Clare Norins

**Sent:** Sunday, February 03, 2008 3:42 PM

**To:** Sundaran, Raju; 'Mirro, James'; 'Farrell, Peter'

**Cc:** Jonathan C. Moore; Rachel Kleinman

**Subject:** Briefing on Rule 72 re Amending Complaints

Hi Jim & Raju:

Counsel in MacNamara consents to the proposed briefing schedule with the understanding that defendants will not be appealing the addition of the as-applied constitutional challenges to the Parading Without a Permit and Disorderly Conduct statutes.

Thanks,
Clare

Clare Rivka Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400 (phone)      (212) 277-5882 (direct)
(212) 557-0565 (fax)

**CONFIDENTIALITY NOTICE:** The information in this e-mail is attorney privileged and contains confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message and its accompanying documents is strictly prohibited. Please delete the message and notify the sender of the receipt of the message by reply. Thank you.

**Circular 230 Disclosure:** To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.